Ronald Irvin RYAN, Plaintiff in error,

v.

STATE of Wisconsin, Defendant in error.†

Court of Appeals

No. 79–1131–CR. Submitted on briefs December 14, 1979.—
Decided January 21, 1980.
(Also reported in 289 N.W.2d 349.)

† Petition to review denied.

For the plaintiff in error, the cause was submitted on the briefs of *Mark Lukoff,* first assistant state public defender.

For the defendant in error, the cause was submitted on the brief of *E. Michael McCann,* district attorney, and *David J. Becker,* assistant attorney general.

Before Decker, C.J., Moser, P.J., and Cannon, J.

CANNON, J. Writs of error issued to review the judgment of conviction of the plaintiff in error (hereinafter defendant), the order denying defendant's motion for a new trial, and the order denying defendant's motion for post-conviction relief pursuant to sec. 974.06, Stats. The defendant was convicted of rape, contrary to sec. 944.01; robbery, contrary to sec. 943.32(1)(a); sexual perversion, contrary to sec. 944.17; false imprisonment, contrary to sec. 940.30; and habitual criminality, contrary to sec. 939.62, Stats., after a trial to a jury on April 26–30, 1976. The defendant was sentenced to a term of forty-eight years in the state prison, *i.e.,* twenty-eight years for rape; ten years for habitual criminality to run consecutive to the rape sentence; ten years for robbery, to run consecutive to the rape sentence; five

years for sexual perversion and two years for false imprisonment, the latter two sentences to run concurrent with the rape sentence.

The case is before us on the following facts. On September 11, 1974, at approximately 3:30 a.m., the defendant approached a woman at the intersection of North Broadway and East Michigan streets in Milwaukee and asked if she had any money. After striking the woman in the face, he grabbed her purse. Defendant then pulled the victim down an alley where he continued to hit her with his fists. He knocked her down, threatened to kill her and removed her clothing. He forced the woman to have sexual intercourse with him and also forced her to perform fellatio. The victim promised to cooperate with defendant's sexual advances to induce him to move away, which he did. The woman was then able to roll under a parked vehicle. The defendant was attempting to pull the victim out by her hair when her screams attracted the police. Upon entering the alley, a police officer saw the defendant run from the scene and apprehended him.

At trial, defendant testified for the first time that he went into the alley when he heard screams, and that he was attempting to help the victim who was pinned under a truck when the police found him. He claimed he panicked and ran when he saw the officers. The victim clearly contradicted this statement by conclusively identifying the defendant as her assailant during the trial. A police officer testified that the defendant made a statement during questioning on September 11, 1974, to the effect that defendant had drunk a quart of vodka on the night of the attack and did not remember anything. To corroborate his story, defendant introduced the testimony of a fellow prisoner from Waupun, Avener Smith (Smith), who testified that he was in the area of the assault on September 11, 1974 at approximately 3:00 a.m. Smith further testified that he "recalled" that he

hit someone severely at that time, and was then in a restaurant on Vliet Street after the alleged altercation. [1]

[1] DIRECT EXAMINATION BY MR. STEWART:

Q Would you state your name for the record, please?

A Avener Smith.

Q And where do you presently reside, sir?

A Presently in Waupun prison. I was sentenced there for rape and sexual assault.

Q I'm calling your attention now to the early morning hours of September 11, 1974, which I believe was a Wednesday. Do you recall where, if anywhere, you were at that particular time?

A Well, like I said before, I recall vaguely the east side of the downtown area here around Michigan and Wisconsin Avenue, Broadway, right in there.

Q Now, calling your attention to approximately 2:00 a.m., 3:00 a.m., or shortly after 3:00 a.m. in the morning of this Wednesday, September 11, 1974, state whether or not you had the occasion to hit anyone?

A As I recall, I did.

Q Do you recall who that person was?

A No, I don't know.

Q Do you recall what, if anything, occurred after you hit that person?

A After that I believe I was at a restaurant up on Vliet, Vliet Street. I struck the person a couple times in the face and that, you know?

Q Do you recall whether or not your blows were slight, mild, severe? Could you categorize the blows?

A I'd say they were severe.

Q Is it your position at this time that you cannot recall anything further after the striking of the blows?

A Well, I'd like to—

Your Honor, could I talk to an attorney?

. . . .

THE COURT: Members of the jury, the Court recessed approximately forty-five minutes ago because the witness indicated that he wished to confer with an attorney. The Court has explained the defendant's constitutional rights to him. Notwithstanding, he wished to have an attorney, and an attorney was appointed in his behalf, has conferred with him concerning his rights. We are now proceeding from the point we left off some forty-five minutes ago.

Smith asked to see an attorney, and then claimed his fifth amendment privilege to all questions asked by the prosecutor on cross-examination. Upon the motion of the state, the court ordered Smith's testimony stricken from the record and instructed the jury to disregard it.

The defendant also attempted to introduce the testimony of another fellow prisoner, Ernest Bach (Bach), to further corroborate his good samaritan story. Bach indicated he would testify to the fact that he had heard Smith incriminate himself regarding the crime at issue while Smith, Bach and the defendant were incarcerated

---

You may proceed.

MR. STEWART:

Q The question, Mr. Smith, is the person who you said you struck, was that person a male or a female?

A Was that the question?

THE COURT: Miss Reporter, would you repeat the question for the benefit of the witness?

(Whereupon the pending question was read back by the reporter.)

A I decline to answer on the ground that my answer may tend to incriminate me, and also on the advice of my Court-appointed lawyer.

MR. STEWART:

Q Did you have conversations concerning this matter with one Ernest Bach in the early part of February and also on Good Friday this year?

A Not that I recall. I can't recall.

Q Did you have conversations concerning this matter with the gentleman to my right, one Ronald Ryan, in the early part of February or on Good Friday of this year?

A I can't remember.

Q Do you know Ernest Bach?

A Yes.

Q Do you know Ronald Ryan?

A Yes.

. . . .

Q Do you know an individual by the name of Janice May?

A I decline to answer on the ground that my answer may tend to incriminate me.

MR. STEWART: No further questions.

at Waupun. The court denied defendant's offer of proof of testimony from Bach because of lack of corroboration.

During final arguments, the defendant moved for a mistrial on the ground that the state's argument on rebuttal violated defendant's right against self-incrimination. Defendant claimed that the Assistant District Attorney's reference to defendant's eighteen-month delay in coming forward with his explanation for being in the alley was in violation of well-established constitutional principles. The trial court denied the motion for a mistrial, but indicated that it would instruct the jury on the issue.

On appeal, the defendant raises the following issues for our consideration:

1. Did the trial court deny defendant his constitutional rights to due process of law, to present a defense, and to call witnesses in his behalf, as guaranteed by the sixth and fourteenth amendments, when:

   (a) The court ordered the testimony of defense witness Avener Smith stricken from the record; and

   (b) The court refused to allow Ernest Bach and defendant to testify as to admissions against penal interest made by Avener Smith?

2. Did the court err in refusing to grant a mistrial during the state's closing argument when the District Attorney told the jury that defendant never told the police his story, although he had ample opportunity to do so?

3. Is defendant entitled to a due process hearing in order to challenge the conclusion of examining physicians that he is not in need of sex deviate treatment?

4. Did the state produce evidence to sustain the element of "asportation" necessary for the conviction of robbery?

I.

Defendant alleges that it was error to strike the testimony of defense witness Avener Smith. Defendant claims Smith did not invoke his fifth amendment privilege in regard to any relevant or material issues, but only to questions involving collateral matters, *i.e.*, matters which dealt with his credibility. This issue is controlled by the decisions of the Wisconsin Supreme Court in *State v. Monsoor*, 56 Wis.2d 689, 203 N.W.2d 20 (1973) ; *Peters v. State*, 70 Wis.2d 22, 233 N.W.2d 420 (1975) ; and *State v. Koller*, 87 Wis.2d 253, 274 N.W.2d 651 (1979). In *Monsoor, supra* at 701, 203 N.W.2d at 25, our court held that it is within the discretion of the trial court to strike the testimony of a person who has refused to answer questions on cross-examination. In exercising this discretion, the trial court must focus on the relevancy and materiality of the questions to the subject matter of the inquiry. The United States Court of Appeals, Seventh Circuit, in *State ex rel. Monsoor v. Gagnon*, 497 F.2d 1126, 1129–30 (7th Cir. 1974) was in accord:

Under *Washington* [*v. Texas*, 388 U.S. 14 (1967)] a defendant may not, consistent with the Sixth and Fourteenth Amendments, be arbitrarily deprived of competent testimony which is relevant and material to the defense. We hold that it is constitutionally impermissible to strike relevant and competent direct examination testimony where a defense witness on cross-examination invokes the privilege against self incrimination with respect to collateral questions which relate only to his credibility and do not concern the subject matter of his direct examination. [Footnotes omitted.]

The Wisconsin Supreme Court in *Peters, supra* at 37–8, 233 N.W.2d at 428 noted:

The language in *Monsoor* to the effect that questions about credibility are collateral refers to questions unre-

lated to the events constituting the crime charged, going to the general credibility of the witness, and not to questions testing the truthfulness of specific testimony of the witness about facts and circumstances relative to the commission of the crime. [Footnotes omitted.]

In this case, the implication of Smith's testimony was that he was the individual who assaulted the victim, not the defendant. His testimony, then, supported the defendant's claim that he was helping the victim when he was apprehended. Smith testified only for a short time, however, before asserting his fifth amendment privilege. The only information he gave was that he was in the area on the night of the assault and recalled severely beating someone. The Assistant District Attorney attempted to elicit additional information about the assault on cross-examination.[2] She also attempted to as-

---

[2] CROSS-EXAMINATION BY MRS. MORONEY:

Q  Mr. Smith, you're currently incarcerated at Waupun?
A  Yes.
Q  And how long have you been there?
A  One year.
Q  And how long are you going to stay there?
A  I don't know.
Q  What is the sentence that you're currently serving?
A  For rape and sexual intercourse without consent.
Q  What is the length of those sentences?
A  Thirty years for the rape charge.
Q  Mr. Smith, isn't it true that in connection with case No. I–2534 you were sentenced for a term of thirty-five years on a count of rape, that you were sentenced for a term of six years consecutive to that upon your conviction for false imprisonment, and that you were given an additional five year sentence consecutive to that upon your conviction of theft from person?
A  Yes.
Q  And so that the total sentence given you was forty-six years, isn't that correct?
A  Right.
Q  And outside of those have you ever before been convicted of a crime?
A  Yes.

certain the relationship between Smith and the defendant to determine whether there was any collusion between

Q How many times?

A I can't recall offhand.

Q Approximately?

A Seven, eight, ten. I don't know. I don't really know for sure.

Q Up to ten times besides the three convictions the sentences of which you are now serving, correct?

A I believe so, yeah.

Q When did you first meet Ronald Ryan?

A I decline to answer on the ground that my answer may tend to incriminate me.

Q How long have you known Ronald Ryan?

A I decline to answer on the ground that my answer may tend to incriminate me.

Q On how many occasions in the past have you talked to Ronald Ryan?

A I decline to answer on the ground that my answer may tend to incriminate me.

Q Sir, you were earlier questioned here this morning regarding September 10, 1974, and September 11, 1974, isn't that correct?

A I decline to answer on the ground that my answer may tend to incriminate me.

. . . .

Q Mr. Smith, were you earlier asked this morning by Mr. Stewart—

THE COURT: Before you proceed, if you wish to jeopardize your record with respect to subsequent motions you may do so, but it's at your peril.

You may proceed.

MRS. MORONEY:

Q How long have you know Ernest Bach?

A I decline to answer on the ground that my answer may tend to incriminate me.

Q When did you meet Ernest Bach?

A I decline to answer on the ground that my answer may tend to incriminate me.

Q Where did you meet Ernest Bach?

A I decline to answer on the ground that my answer may tend to incriminate me.

Q On how many occasions did you talk to Ernest Bach in the presence of Ronald Ryan?

A Same answer.

the parties who were testifying on behalf of one another. We do not consider the questions asked or the information sought to be collateral. The prosecutor directed questions to both the events of September 10–11, 1974, and to the truthfulness of the witness concerning facts and circumstances relative to the commission of the crime. Smith's testimony on direct examination went to material issues in the case, and it is unlikely that, given the opportunity, the state would have failed to go into depth regarding the testimony. However, it is apparent from the record that the state was frustrated in its attempt. Once Smith invoked his privilege, he made it clear that he would refuse to answer *any* further questions on cross-examination. The state was, therefore, denied the right to a meaningful cross-examination of the defendant. Moreover, the information given by Smith was so sparse as to compel us to agree with the trial court that Smith's testimony was so "vague and inconclusive as to merit no weight by the jury."[3]

Q  Do you recall what you did September 9, 1974?
A  Same answer.
Q  Do you recall what you did September 8, 1974?
A  Same answer.
Q  Do you recall what you did September 7, 1974?
A  Same answer.
Q  Do you recall what you did September 12, 1974?
A  Same answer.
Q  Do you recall what you did at any time in the past?
A  Same answer.
MRS. MORONEY:  I have no further questions.

[3] This testimony is so vague and inconclusive as to merit no weight by the jury. The defense that, "some other person did it" is legitimate in evidence which gives rise to a reasonable inference and is relevant, but the mere fact that Smith testifies in the vaguest manner that he was in the vicinity at approximately the same time, that later he was in another place far removed, and that he struck a person, does not possess sufficient probative value on the issue of guilt or innocence to be considered by the jury. His refusal to answer probative questions on cross-examina-

The standard on appeal regarding reversal for abuse of discretion by the trial court in striking the testimony of a witness who has refused to answer questions on cross-examination was stated in *Monsoor, supra* at 701–2, 203 N.W.2d at 26.

". . . The exercise of discretion by the trial court to deny or restrict cross-examination must be dependent upon the circumstances of the trial. This court will not reverse unless it clearly appears that the trial court abused its discretion and that the error affected a substantial right of the complaining party and probably affected the result of the trial." [Quoting *Neider v. Spoehr*, 41 Wis.2d 610, 618, 165 N.W.2d 171, 175 (1969).]

We hold that the trial court acted within its discretion in striking Smith's testimony.

Defendant also alleges error because the trial court refused to allow Ernest Bach (Bach) to testify regarding admissions against interest made by Smith. Bach was a fellow prisoner at Waupun, and offered testimony to the effect that Smith had admitted his involvement in the assault on two occasions. The testimony was offered under sec. 908.045(4), Stats. as an exception to the hearsay rule:

---

tion on the ground of self-incrimination is a further basis for striking his testimony. A witness's answers to questions on direct cannot stand if he denys [sic] the right of effective cross-examination to the opposing side even if he relies upon constitutional grounds.

Based upon a review of the testimony of Smith, it is clear that his refusal to testify was not limited merely to extraneous matters pertaining to his credibility or subjects unrelated to the case. Smith was refusing to make explication concerning his previous testimony. [Citations omitted.]

The logic of not allowing a person to testify as to facts supportive of one party to a lawsuit when he refuses to answer questions on cross-examination to the same facts is irrefutable.

908.045    Hearsay exceptions; declarant unavailable. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . . .

(4) Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability or to render invalid a claim by the declarant against another or to make the declarant an object of hatred, ridicule, or disgrace, that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborated.

The trial court held the testimony inadmissible because it was not corroborated.[4] We agree.

[4] THE COURT: I think that the ruling of the Court has already been made concerning the defense's request. To make it clear, the Court interprets the statute in question concerning statements by third parties being offered to exonerate the defendant in a criminal charge must be corroborated. The statement must be corroborated, not the making of the statement. Fifteen, twenty people could have heard the statement, and this would not be considered corroboration of the statement. It's merely of the making of the statement and does not fulfill the requirements of the statute. What is required is some support, some corroboration of what the statement purports to speak to. That the Fifth Amendment was resorted to by Smith has already been used by the defendant as a basis for making exception to the hearsay. It cannot be used as a further boot strap to get it in without corroboration. The testimony of Smith indicated that he was present in Milwaukee, that he was present in the area at the time, that he struck a person once or more times vigorously, is not corroboration of any of the charges that this defendant stands charged with. Based upon these statements, their vagueness, evasiveness, and their subsequent protection that the Court allowed when the witness took the Fifth Amendment, makes such testimony to be void of any probative value in the case.

■

The standard by which a trial court should evaluate the admission of hearsay testimony was set out in *United States v. Guillette*, 547 F.2d 743, 754 (2nd Cir. 1976).

The determination whether corroborating circumstances clearly indicate the trustworthiness of a third party confession lies within the sound discretion of the trial court, which is aptly situated to weigh the reliability of the circumstances surrounding the declaration, and this Court will review the exclusion of the Souca confession only for an abuse of discretion.

■

In *Chambers v. Mississippi*, 410 U.S. 284 (1973), the Court indicated that certain assurances of trustworthiness must be present if hearsay testimony concerning a third party's statement against penal interest is to be admitted. The following four factors are to be considered in ascertaining the trustworthiness of any such testimony:

1. time of the statement and the party to whom the statement was made;
2. existence of evidence corroborating the statement;
3. extent to which the statement is self-incriminating and against penal interest;
4. presence of declarant in courtroom to testify if necessary.

*See also State v. Brown*, 85 Wis.2d 341, 270 N.W.2d 87 (Ct. App. 1978); *State v. Sharlow*, 61 Wis.2d 388, 212 N.W.2d 591 (1973).

■

Applying these criteria to the circumstances of Smith's declaration, we do not find sufficient indicia of reliability to require admission. First, Smith allegedly made his incriminating statements months after the assault when the three individuals involved, Bach, Smith and the de-

fendant, were inmates at the state prison. There is no indication that the three were close friends, nor was there testimony that they knew each other before they met in prison. By contrast, the declarant in *Chambers* confided in three close friends shortly after the murder for which he claimed responsibility. Second, there is not any significant corroborating evidence to tie Smith to the assault. He testified to being in the area of the assault and then in a bar. There was no independent evidence to establish his presence either at the scene of the assault or at the bar. Third, we are of the opinion that Smith's testimony was not against his penal interest. Defendant cites *United States v. Benveniste*, 564 F.2d 335, 341 (9th Cir. 1977) for the proposition that Smith's assertion of his fifth amendment right "lends strong support to the conclusion that [his] testimony would tend to subject [him] to criminal liability." We do not feel, however, that the statements made here are of a nature to expose Smith to criminal responsibility. Smith's statements that he recalled being in the area and that he recalled hitting someone would not withstand the probable cause requirement for charging him with the crime at issue. While the hearsay exception is not intended to apply only to statements which amount to direct confessions of criminal responsibility, the statute does require that the statements *tend to subject* the declarant to criminal liability before the hearsay can be admitted. Here, Smith did little more than attempt to supply a basis for an inference of general responsibility for the crime at issue. We find such an attempted inference, although cleverly conceived, too attenuated to be sufficiently corroborative of the information offered by Bach and the defendant. Finally, we do not think that the fourth factor, that of Smith's availability to testify, is important in this particular fact situation. Smith's unavailability for cross-examination by virtue of his invocation of the fifth

amendment is counterbalanced by the fact that he did not make any statements of an inculpatory or exculpatory nature. To summarize, then, the defendant wishes us to accept the argument that the statements of the defendant himself and Bach sufficiently corroborate themselves without additional independent substantiation. We refuse to accept this argument, and again uphold the trial court's exercise of discretion.

## II.

Defendant next alleges that the trial court erred in not granting his motion for a mistrial during rebuttal argument. Defendant objected to the prosecutor's reference to defendant's eighteen-month silence in explaining his reason for being in the alley on the night of the assault. Defendant characterizes the reference to his silence as an unconstitutional denial of his right against self-incrimination. He relies on *Doyle v. Ohio,* 426 U.S. 610 (1976); *United States ex rel. Allen v. Rowe,* 591 F.2d 391 (7th Cir. 1979); *Reichhoff v. State,* 76 Wis.2d 375, 251 N.W.2d 470 (1977). The defendant's arguments must fail, however, for he did not invoke his right to remain silent at the time of arrest. Rather, a police officer testified that defendant made the statement "I drank a quart of vodka that night and don't remember anything." The prosecutor's comment on defendant's later story that he was rescuing the victim and not assaulting her, was therefore not aimed at defendant's silence but at his credibility. His fifth amendment right to silence was not violated. *See Lofton v. State,* 83 Wis.2d 472, 266 N.W.2d 576 (1978).

## III.

Defendant next alleges that he was deprived of his fourteenth amendment right to due process when he was

denied a hearing on the question of sex deviancy. He alleges such a hearing was necessary to give him an opportunity to demonstrate that he was in need of treatment. Chapter 975, Stats., requires that a defendant convicted of a sex offense be committed to the Department of Health and Social Services (DHSS) for mandatory examination regarding the need for specialized treatment. If such defendant is found to be in need of specialized treatment, sentencing would not occur under applicable penal penalties, but commitment to the DHSS would occur. At such time, the defendant would be entitled to a hearing. In this case, the DHSS did not recommend specialized treatment for defendant. The trial court denied the defendant's motion for a hearing on the recommendation of the DHSS that the defendant was *not* in need of specialized treatment. Defendant bases his constitutional argument for a hearing on the fact that without it he is "condemned to suffer a grievous loss" of an interest in liberty. *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 168 (1951). As stated in defendant's brief at 39:

Due process required a hearing in this situation. The rape and sexual perversion statutes under which Mr. Ryan was convicted, secs. 944.01 and 944.17, Stats., subjected him to possible imprisonment of up to thirty-five (35) years. In contrast, a commitment for treatment might have been terminated in as brief a time as two (2) years. Sec. 975.11, Stats. In either case, Mr. Ryan faced the crucial determination of whether the immediately succeeding years of his life were to be spent in prison or a treatment facility, with all the differences between those two places.

Mr. Ryan certainly had a "liberty" interest in this determination since the question of where he would be detained, and almost certainly how long, hung in the balance.

■

We find defendant's arguments unpersuasive. The Wisconsin Supreme Court addressed the identical issue

in *Schmidt v. State,* 68 Wis.2d 512, 228 N.W.2d 751 (1975). The court in *Schmidt* unequivocally held that a determination by DHSS that a defendant's criminal act "was not the result of sexually deviant behavior does not subject the defendant to a 'grievous loss' and that he has not been deprived of liberty or property without due process of law." *Schmidt* at 520, 228 N.W.2d at 756. We find *Schmidt* controlling and hold, therefore, that defendant can be summarily denied entrance into the sex deviancy program without a hearing.

## IV.

Defendant's last argument on appeal is that the state failed to produce sufficient evidence to sustain the element of asportation necessary for a conviction of robbery. *See Moore v. State,* 55 Wis.2d 1, 197 N.W.2d 820 (1972). Defendant claims that the only proof introduced by the state showed that, at most, defendant took the purse from the victim and dropped it. We disagree. Having reviewed the record in its entirety and considering the evidence in the light most favorable to the state, we find that it is sufficient to sustain the determination of guilt with respect to the robbery.

The defendant wrested possession and control of the purse from the victim by force and carried it to the entrance to the alley. The fact that defendant abandoned the purse does not alter the fact that he had assumed absolute possession after forcibly removing it from the owner's person. In *People v. Quiel,* 68 Cal. App.2d 674, 157 P.2d 446, 448-9 (1945) the court noted:

Asportation within the meaning of the statute prohibiting theft may be fulfilled by wrongfully and unlawfully removing property from the possession or control of the owner, against his will with the intent to steal it, even

though the property may be retained by the thief but a moment. *People v. Meyer*, 75 Cal. 383, 17 P. 431; *People v. Dukes*, 16 Cal. App.2d 105, 60 P.2d 197, 198; 15 Cal. Jur. 905, sec. 11; 144 A.L.R. 1385, note. The fact that the thief is frustrated in his attempt to carry stolen property away, or that he may change his mind immediately after the theft, because he concludes that the property is of insufficient value to warrant him in retaining it, does not relieve him of the consequence of the theft.

More recently, the Wisconsin Supreme Court stated:

The asportation requirement should be considered in light of the statute's general purpose to proscribe the exercise of unauthorized control over the movable property of another. "Carrying away" must be given a practical, common-sense construction. While the asportation requirement may be satisfied by proof of the slightest movement, it is implicit in the statute that the movement must be a movement away from the area where the product was intended to be. *Berry v. State*, 90 Wis.2d 316, 330, 280 N.W.2d 204, 211 (1979). *See also Hawpetoss v. State*, 52 Wis.2d 71, 187 N.W.2d 823 (1971).

We hold that the jury, acting reasonably, could be convinced that the defendant consummated the crime of theft.

*By the Court.*—Judgment and orders affirmed.